# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

MARK HOGAN; ELIZABETH M. HOGAN; MARK
HOGAN and ELIZABETH M. HOGAN as Guardians and
o/b/o their minor children, J.H. and I.H.; DENNIS B.
OKUDINANI as Guardian and on behalf of D.O.,

*Plaintiffs,*

v.

COUNTY OF LEWIS, NEW YORK; SERGEANT
RYAN LEHMAN, in his individual and official capacity;
DEPUTY BRETT CRONEISER, in his individual and
official capacity; DAVID VANDEWATER; FRANK
ROSE; RUSSELL FALTER; KATHY WILSON;
LEANNE MOSER, in her individual and official capacity
as District Attorney for the County of Lewis, New York;
CALEB PETZOLDT, in his individual and official
capacity as an Assistant District Attorney for the County
of Lewis, New York; and JOHN DOE(S) AND JANE
DOE(S),

*Defendants.*

**Civil Action No.
7:11-CV-754 (BJR)**

**MEMORANDUM
OPINION, ORDER,
AND JUDGMENT**

Plaintiffs Mark and Elizabeth Hogan brought the present action in July 2011, alleging New York state property law claims against Defendants David Vandewater, Frank Rose, Russell Falter, and Kathy Wilson.[1] Plaintiffs have two remaining claims: Plaintiffs allege that Vandewater interfered with their easement to certain lake lot properties, and that all Defendants created or engaged in various incidents amounting to private nuisances. This matter came before the Court for a bench trial between June 12 and June 16, 2017. The parties were represented by counsel.

---

[1] Plaintiffs initially brought 14 claims on behalf of themselves, their minor children, and a minor family friend, alleging violations of various federal statutes—as well as additional state law torts—against local law enforcement officials, Lewis County, and the remaining civilian Defendants. Pls.' Am. Compl., Doc. 4. At the summary judgment stage, Judge Lawrence C. Kahn dismissed all but the two property claims. Doc. 236.

The Court heard testimony from the following witnesses: Plaintiffs Mark and Elizabeth Hogan (hereinafter "Hogan"); the Hogans' daughter, Ithaca Grace Hogan; the Hogans' family friends, John Sakowich and Denny Okudinani; and the Hogans' expert surveyor, Stephen Moncrief. The Court additionally heard testimony from: Defendants David Vandewater, Frank Rose, Kathy Wilson, and Russell Falter; and Defendants' expert surveyor, Duane Frymire. Having reviewed the testimony and all exhibits entered into evidence together with the parties' briefs and all relevant materials, the Court finds and rules as follows:

## I.     FACTUAL BACKGROUND

This case represents the latest skirmish in a continuing saga of disputes between neighboring property owners of subdivided lots within Great Lot 24 in the Town of Greig, New York. Great Lot 24 encompasses over 175 acres of wooded, recreational land. Great Lot 24 also includes two spring-fed lakes: Hiawatha Lake 1 and Hiawatha Lake 2. In 1927, Great Lot 24 was owned by Zoltan Mihalyi. Mihalyi, together with the help of engineer Royal B. Smith, subdivided Great Lot 24 into 41 lake lots surrounding Hiawatha Lake 1, and 36 lake lots surrounding Hiawatha Lake 2. To memorialize the subdivision, Smith drew two plans or maps: "Map 42," which was filed with Lewis County in 1927 ("the 1927 Map"), and "Map 180," which was filed with the County in 1928 ("the 1928 Map"). Pls.' Ex. 11; Defs.' Ex. 2. Both Maps include identical drawings of the Lakes, and identical measurements of the lake lots' side lines. The only differences between the two Maps is that the 1928 Map adds five feet more to the lots' lake-frontage; and it depicts the sale of one lake lot.

The parties own the following relevant property. Defendant Vandewater has owned Great Lot 24 since 1996. Vandewater additionally owns certain lake lots on Hiawatha Lake 1, though his cabin sits in a wooded area approximately one mile away from the southwest corner of Lake

1. The Hogans have owned property in Great Lot 24 since 1992. On Lake Hiawatha 1, the Hogans own Lots 6-7, 10-14, and 19-22. Lots 6 and 7 are vacant, though the Hogans' children historically erected a tent there. The Hogans' cabin sits on Lots 12 and 13. Lots 19 through 22 have, since their purchases between 2005 and 2010, remained vacant and unimproved. Defendant Rose has owned Lots 23 and 24 since 2002 and 2003, respectively. On his lots, Rose built a cabin and other small structures. Defendants Falter and Wilson have owned Lots 34 through 38 since 2001.

## II.    THE INTERFERENCE WITH EASEMENT CLAIM

In an earlier case, *West v. Hogan v. Vandewater*, CA2006-000535 (N.Y. Sup. Ct. April 7, 2010) ("the *West* action"), the Hogans and Vandewater[2] reached a stipulation as to the Hogans right of way to their Lots 22, 21, and 19 that was later memorialized in the court's order resolving that portion of the dispute. Specifically, in an order filed on April 7, 2010, Judge Merrell ordered that the location of the right of way for the Hogans' Lots 22, 21, and 19 is:

> [A]long the common right of way from Chase Lake Road as it proceeds along the east side of Hiawatha Lake 1 and then proceeds in a clockwise direction around Hiawatha Lake 1 to that right of way's intersection with the southeasterly corner of Lot 23, thence along the back lot lines of Lots 19-23, at a width of 12 feet from those back lot lines, terminating at the northerly lot line of Lot 19.[3]

Order and J. Upon Verdict ("the *West* Order") at 5-6, Pls.' Ex. 26. The parties and the court believed at the time that they had resolved the issue of the easement. Unfortunately that was not the case. A dispute arose as to where the back line of Rose's Lot 23 was located. This dispute serves as the basis of the Hogans' interference with easement claim against Vandewater as

---

[2] Defendants Rose, Falter, and Wilson were not parties to this action.

[3] The *West* Order indicates that Chase Lake Road proceeds along Hiawatha Lake 1. At the trial before this Court, however, the parties agreed that Hiawatha Lake Road—and not Chase Lake Road—winds around the Hiawatha Lakes, and is the relevant road off of which lake lot owners access their properties. *See* Defs.' Ex. 40. The parties further agree that Chase Lake Road is a New York State road located outside the bounds of Great Lot 24. *See id.* A map accessed on Google confirms that Hiawatha Lake Road is, indeed, the relevant road. http://maps.google.com; *Rindfleisch v. Gentiva Health Sys., Inc.*, 752 F. Supp. 2d 246, 259 (E.D.N.Y. 2010) ("Courts commonly use internet mapping tools to take judicial notice of distance and geography").

Vandewater's Great Lot 24 abuts the back lot line of Rose's Lot 23, and thus the Hogans' easement would necessarily be across Vandewater's Great Lot 24.[4]

Following the *West* Order, Vandewater, using signs and wooden posts, marked where he believed the back line of Lot 23 was located: 151 feet away from the shoreline. Vandewater believed this to be the correct location because Smith's 1927 and 1928 Maps both depict that the southeasterly corner of Lot 23 sits 151 feet from its shoreline. From that back lot line location, Vandewater marked a 12-foot wide route to Lots 22, 21, and 19. Hogan, however, believes that the easement is located approximately 36 feet to the northeast, through land that Rose has historically used as his driveway and back yard. Immediately after the *West* Order, Hogan began travelling through this route, coming in close contact with Rose's cabin and other structures on Lot 23, crossing what Rose believed to be his property. Hogan alleges that Vandewater incorrectly marked and otherwise "blocked" the Hogans' easement, thereby giving rise to the interference with easement claim.

## A. Legal Standards

An easement entitles one owner of land to the use of another's land for a limited purpose. *See, e.g., Nature Conservancy v. Congel*, 689 N.Y.S.2d 317, 319 (App. Div. 1999). The easement holder (in this case Hogan) owns the dominant tenement. The easement grantor (in this case Vandewater) owns the servient tenement, and retains "a possessory interest in the land," which the grantor can use "for any purpose consistent with the dominant owner's or grantee's enjoyment of the easement." *Sutera v. Go Jokir, Inc.*, 86 F.3d 298, 302 (2d Cir. 1996) (citing *Bakeman v. Talbot*, 31 N.Y. 366, 370 (1865)). "Although no affirmative duty is imposed on the servient owner,"

---

[4] The Court ruled previously that the *West* Order's language "along the back lot lines" and "from the back lot lines" indicates "that the easement begins precisely at the edge" of Rose's Lot 23. Mem.-Decision and Order on Summ. J., Doc. 236 at 9-10.

*Sutera*, 86 F.3d at 302, "[t]he servient tenement is prohibited from unreasonably interfering with the rights of the [dominant tenement] to use the easement." *Green v. Mann*, 237 A655 N.Y.S.2d 627, 628-29 (App. Div. 1997). To demonstrate that interference is unreasonable, plaintiffs must prove that a grantor-defendant "substantially interfere[d]" with the easement holder's "reasonable use and enjoyment of [the] easement." *LeBaron v. DPL & B, LLC*, 826 N.Y.S.2d 627, 627-28 (App. Div. 2006); *see also Wilson v. Palmer*, 644 N.Y.S.2d 872, 872-73 (App. Div. 1996). Whether interference is unreasonable is a question of fact. *See, e.g., Green*, 655 N.Y.S.2d at 628-29; *Meyerson v. Mele*, 277 N.Y.S.2d 781, 784 (Sup. Ct. 1962), *aff'd*, 240 N.Y.S.2d 934 (App. Div. 1963); *Brearton v. Fina*, 155 N.Y.S.2d 399, 405-06 (Sup. Ct. 1956). The fact-finder's analysis depends primarily on the specific language of the grant of the easement, "aided where necessary by any circumstances tending to manifest the intent of the parties." *Marsh v. Hogan*, 867 N.Y.S.2d 786, 787-88 (App. Div. 2008) (internal quotation omitted); *accord Meyerson*, 227 N.Y.S.2d at 784; *Brearton*, 155 N.Y.S.2d at 405-06.

## B. The Easement Location

The Court turns first to the location of the Hogans' easement. The Court begins with an examination of the relevant deeds to Great Lot 24, Lake Lot 23, and the neighboring parcels. Whether the 12-foot easement is part of Great Lot 24, or whether it is part of what is presently Rose's Lot 23, depends on the location of the rear boundary line of Rose's Lot 23. Vandewater's deed to Great Lot 24 conveys, in relevant part, all land except for "all camp lots laid out around [the Hiawatha Lakes], as surveyed and mapped by Royal B. Smith," whose maps are "on file in the Lewis County Clerk's Office[.]" Defs.' Ex. 5. Rose's deeds to Lot 23 and Lots 24, respectively—as well as Hogans deed to Lots 22 and 21, and their deed to Lot 19—similarly describe the conveyed parcels according to Smith's 1927 Map. Rose's Deed (Lot 23), Defs.' Ex.

3; Rose's Deed (Lot 24), Defs.' Ex. 4; Beadore to Hogan deed (Lots 22 and 21), Deed Book 2006,

Page 1881, Lewis County New York Records; Helmer to Hogan deed (Lot 19), Deed Book 2005,

Page 320, Lewis County New York Records.[5]  "Property may [ ] be described by reference to a

map or plat on file in the register's office.  When such resort is made, the filed map must be taken

as part of the deed and explanatory notes contained on the map become part of the description."

*Town of Brookhaven v. Dinos*, 431 N.Y.S.2d 567, 572 (App. Div. 1980), *aff'd*, 429 N.E.2d 830

(N.Y. 1981) (internal citations omitted).  Given that these deeds all reference Smith's Maps—and

only Smith's Maps—the Court finds that the location of the back lot line of Lot 23 is determined

according Smith's 1927 and 1928 Maps. *See, e.g., Town of Fowler v. Parow*, 42 N.Y.S.3d 416,

418 (App. Div. 2016) ("[A] deed must be construed according to the intent of the parties and, [ ] a

court is to give effect and meaning, to the degree possible, to each and every phrase or part of the

deed." (internal quotation omitted)).

    The parties presented the Court with Smith's 1927 and 1928 Maps.  The Court noted the

following: (1) the side lot line of Lot 23 is depicted as 151 feet from the Lot's shoreline on both

Maps; (2) the side lot line distances of Lots 24 through 19 on Hiawatha Lake 1 are identical

between the two Maps; (3) the side lot lines are the only ones that, in addition to having set

distances, also contain bearings, or angles represented by degrees; (4) the back lot line distances

of Lots 24 through 19 on Hiawatha Lake 1 are identical between the two Maps; (5) Smith's 1927

Map provides for 45 feet of lake-frontage for the lots surrounding Hiawatha Lake 1, while his 1928

Map provides for 50 feet of lake-frontage; (6) the sizes of the Lakes are nevertheless identical

---

[5] The Court was not provided with the Hogans' deeds to Lots 22, 21, and 19, respectively.  The Court may, however, take judicial notice of real property deeds. *See, e.g., Trefoil Capital Corp. v. Creed Taylor, Inc.*, 504 N.Y.S.2d 112, 114 (App. Div. 1986); *DeMeo v. Santangelo*, No. 10–CV–2276, 2011 WL 1322364 at *3 (E.D.N.Y. March 1, 2011). Accordingly, the Court further notes that the deeds to Hogans' Lots 6, 7, 9, 11-14, and 29-33 convey the respective parcels according to Smith's 1927 Map as well. *See* searchqis Detailed Information, Lewis County Clerk's Office, https://www.searchiqs.com/NYLEW/SearchAdvancedMP.aspx (last visited June 26, 2017).

between the two Maps (*i.e.*, the outermost ring representing the shoreline of each Lake is in the identical location); (7) Smith's 1927 Map contains six "rings" around the perimeter of the Lakes, while his 1928 Map contains eight such rings; and (8) the 1928 Map indicates that Mihalyi sold one lot, Lot 8, on which two iron pipes, or "monuments," were set along the Lot's shoreline—but not along its back line.

The parties presented the Court with three surveys each purporting to provide the intent behind Smith's maps.[6] The Hogans offered Stephen Moncrief's 2003 survey of Rose's Lot 23, which Rose did not file with the Clerk's Office, as well as Moncrief's 2005 survey of the Hogans' Lots 22 and 21. Pls.' Exs. 14, 28. Defendants offered Duane Frymire's 2014 survey of Rose's Lots 23 and 24, which Rose filed with the Lewis County Clerk's Office in 2015. Defs.' Ex. 6. Both Moncrief and Frymire testified at trial. The experts agree that Rose's Lot 23 has a depth of 151 feet. According to Moncrief, however, the side lot line of Lot 23 spans just 114.68 feet from the existing shoreline of Lake 1. In other words, Moncrief maintains, Rose owns 151 feet worth property, but 36.32 of those feet are presently located under the water of Hiawatha Lake 1. According to Frymire, the side lot line of Lot 23 spans 151 feet from the existing shoreline of Hiawatha Lake 1.

Moncrief does not contest that Smith's Maps depict that the side lot lines for the lake lots (including Lot 23) run from the shoreline of Hiawatha Lake 1 to a back lot line that abuts Great Lot 24. Nor does Moncrief contest that in 1927 and in 1928, Lot 23 was meant to have a depth of 151 feet. Nevertheless, Moncrief maintains that the current side lot line of Lot 23 spans only

---

[6] Vandewater additionally presented the Court with a demonstrative, not-to-scale map, depicting the routes and locations of the following: the State land that borders Great Lot 24; Chase Lake Road, the State road that leads to Great Lot 24; Hiawatha Lake Road, which intersects with Chase Lake Road at the east entrance of Great Lot 24; Vandewater's house in Great Lot 24, and the private road off of Hiawatha Lake Road that he uses to access that house; and the parties relevant lots bordering Lake 1. Defs.' Ex. 40.

114.68 from the existing shoreline of Hiawatha Lake 1. Moncrief offers two theories to support his survey results, *i.e.*, that 36 feet of the lots are underwater. First, Moncrief testified that certain surveyors theorize that at some point since 1928, some persons manually "raised" Lake 1 using 12-inch wooden boards, thereby increasing the overall size of the Lake. Second, Moncrief testified that other surveyors claim that Smith drew the Lakes incorrectly. Moncrief himself subscribes to the second theory: that Smith drew Lake 1 "incorrectly." As a result, Moncrief maintains, Rose's current ownership is 36.32 feet underwater. In short, Moncrief testified, he believes Smith's depiction of the waterline is incorrect and the "solution" is that the lots extend into the water. The Court notes, however, that 150 feet is the smallest side lot line that Smith drew on either Map. It does not follow, therefore, that Smith would have intended for any of his lots to be as shallow as 114.68 feet.

Moncrief further maintains that the outer perimeter of lake lots—and not the lots' individual depths—was of paramount importance to Smith. Thus, in conducting his survey, Moncrief first "solved" the outer perimeter of the lake lots, and then "la[id] out" the rest of the subdivision. Moncrief did not explain, however, how he "solved" this perimeter given that Smith did not provide bearings for the back lot lines.[7] It takes both distances and bearings to define any particular line. Smith provided distances and bearings *only* for the side lot lines, which themselves provide the lots' depth measurements.

Moreover, "[i]n determining the location of property boundaries, natural landmarks and artificial monuments take precedence over mere metes and bounds descriptions." *Brown v. Ames*,

---

[7] Moncrief's 2003 survey does depict an "iron pipe found" at the southeasterly corner of the back line of Lot 23. However, it is unclear both from his testimony and from the survey when and by whom the pipe was set. Moreover, according to Frymire, two pins are needed to accurately "rotate" an overlaid map. Moncrief's 2003 survey shows only one such pin. Additionally, Moncrief testified that he first "solved" the outer perimeter of the Lake 1 lots in 1990, and that this perimeter "laid the foundation" for the surveying work he did for Rose's Lot 23 in 2003 and for Hogans' Lots 22 and 21 in 2005. The Court is unsure, therefore, whether the relevant "iron pipe found" by Moncrief in 2003 was actually placed by Moncrief at an earlier date. Frymire's testimony stated as much.

735 N.Y.S.2d 664, 665 (App. Div. 2002) (internal quotation omitted). The only natural landmarks and artificial monuments depicted in Smith's Maps are Hiawatha Lakes 1 and 2, and the shoreline pins set on Lot 8, respectively. Accordingly, Moncrief's contentions are incongruous both with Smith's clear intention that the lots contain a certain lake frontage and be of a certain depth, and contrary to established New York norms. *See id.*; *Zelnik Realty, Inc. v. York*, 566 N.Y.S.2d 752, 753 (App. Div. 1991); *Thomas v. Brown*, 535 N.Y.S.2d 836, 837 (App. Div. 1988); *Pauquette v. Ray*, 397 N.Y.S.2d 442, 443 (App. Div. 1977); *Case v. Dexter*, 106 N.Y. 548, 554 (1887).

Frymire, by contrast, offered a survey supported by natural landmarks, artificial monuments, and his observation and measurements of the land. Frymire testified that after locating Hiawatha Lake 1, he searched for iron pipes and other artificial monuments around the Lake. For example, Frymire waived a metal detector both along the 50-foot shoreline and approximately 20 feet into the water off of Lots 23 and 24. Further, Frymire, in his survey, listed other maps and surveys previously conducted on the neighboring lots; and he clearly identified prior surveyors' pins and measurements. In his testimony, Frymire credibly explained why he "held" or used certain pins and rejected others. Frymire's expert testimony went essentially unrefuted.

Taking into account the testimony of the experts together with the exhibits admitted into evidence, the Court finds and rules that the correct location of the Hogans' easement as it intersects with the southeasterly corner of Lot 23 is 151 feet from Lot 23's existing shoreline of Hiawtha Lake 1, and it proceeds along the back lot line of Lot 23 at this distance and according to Frymire's survey. In so finding, the Court holds that Frymire's survey gives the proper intent to Smith's plans, and is thus determinative of the easement's location. The Court rejects the survey offered by Moncrief, which contends that Lot 23's side lot line spans just 114.68 feet. Indeed, the Court

finds that the Moncrief survey fails in every way to take into account historical and present reality. Aside from placing close to 25 percent of the lots underwater, Moncrief's calculations would make the lots essentially unusable given the various setback requirements.

As an aside, the Court has difficulty understanding why Hogan would prefer to credit Moncrief's calculations over Frymire's. Moncrief's survey deprives the Hogans of nearly 25 percent of their land. Moreover, the route that Hogan argues for is clearly less convenient and more costly for Hogan for at least two reasons. First, Hogan's preferred route would place him on land that Rose uses as his driveway, and in close proximity to Rose's cottage and shed. *See, e.g.*, Defs.' Ex. 6. Second, Hogan would have to build a retaining wall near Rose's shed to make the 12-foot wide right of way usable. *See, e.g.*, Defs.' Ex. 12b. The proper route (as marked by Vandewater and determined by Frymire) requires only the clearing of trees. *See, e.g.*, Defs.' Exs. 12, 12a. Thus, it is clear to the Court that Hogan's preference is grounded in the active hostility between Hogan and his neighbors, which has been the subject of four lawsuits and countless accusations to the sheriff and other local agencies.

One example of Hogan's hostility is his attack on Frymire. The men met and had a pleasant exchange while Frymire was conducting his survey in 2014. Shortly thereafter, however, Hogan proceeded to not only file a complaint against Frymire with the Secretary of State's licensing board "seeking the immediate suspension of [Frymire's] Survey and Law licenses," Def. Ex. 28, he called the state troopers, who arrived at Frymire's house with a summons to appear in court for a criminal case. (The case was later dismissed.)

Once it is settled that the southeasterly corner of Lot 23 is located 151 feet away from the existing Lot's shoreline—and, therefore, that the path behind Rose's shed where Hogan began travelling following the *West* Order is properly part of Rose's Lot 23—it is clear that Vandewater

did not interfere with the Hogans' easement. The *West* Order was issued April 7, 2010. As of May 1, 2010, Vandewater had taken steps to designate what he believed was the correct location of the Hogans' easement: he stuck wooden posts with orange flags in the ground and hung signs that read "Rose Back Line," "12' R.O.W. [right of way]," and "right of way, here." Defs.' Exs. 12a-f; Pls.' Exs. 2n-2o. The Court finds that Vandewater marked the correct location; thus, he did not interfere with the Hogans' easement. *See, e.g., Sambrook v. Sierocki*, 861 N.Y.S.2d 483 (App. Div. 2008); *Guzzone v. Brandariz*, 868 N.Y.S.2d 755 (App. Div. 2008); *Lewis v. Young*, 705 N.E.2d 649, 651-52 (N.Y. 1998).

The Hogans purchased Lot 20 approximately seven weeks after the *West* Order was issued. Hogan testified that he bought Lot 20 under "extenuating circumstances," and because the lot has in its deed a right of way at a "route convenient" through Great Lot 24. The Court cannot find any such language. *See* Lewis County to Hogan deed, Deed Book 2010, Page 3402, Lewis County New York Records. The Hogans' Lot 20 deed transfers only those rights of way and easements that were, in 2007, "assessed to Wayne Brown," from whom Lewis County bought the lot. Brown to Lewis County deed, Deed Book 2010, Page 976, Lewis County New York Records. Wayne Brown's 2007 deed states only that "[t]he conveyance is made subject to all valid restrictive covenants, easements, and rights of way, if any, of record, or which may be apparent from an inspection of the premises." N.R.L.L. East LLC to Brown deed, Deed Book 2007, Page 2324, Lewis County New York Records. Attached to the deed, an exhibit states that "the property being sold [is] a vacant lot and as such has not been assigned a proper street number[.]" *Id.* at Ex. A. In any event, the Court has found that the easement that Vandewater previously marked, which is consistent with the Frymire survey, provides the Hogans a convenient route for their Lots 22, 21, and 19. Lot 20, of course, sits between the Hogans' Lots 21 and 19. In the absence of any evidence

to the contrary, the Court finds that the *West* Order pertains to Lot 20 as well.  In other words, the Hogans are not owed another right of way across Great Lot 24 to access Lot 20 in addition to or different from the easement discussed above. *See* Decision/ Order, *West v. Hogan v. Vandewater*, Index 2006-535 (N.Y. Sup. Ct. Nov. 2, 2009) (rejecting Hogans' contention that as a matter of law, Lots 6 and 7 must have separate rights of way, and finding that evidence supported the jury verdict that the single right of way designated by Vandewater was "reasonable and convenient" for both lots); *see also Guzzone*, 868 N.Y.S.2d at 756; *Lewis*, 705 N.E.2d at 662.

## III.   PRIVATE NUISANCE CLAIMS

The precise allegations underlying the Hogans' private nuisance claims are more difficult for the Court to discern.  The Hogans' witnesses testified about approximately 12 instances—or categories of instances—over the last nine years during which Hogan has clashed with Defendants (and other non-party neighbors) on various parcels within the subdivision.  It appears to the Court that the crux of the Hogans' nuisance claims is that Defendants engaged in hostile conduct, at times temporarily "blocking" or otherwise preventing the Hogans from "enjoying" their property.

### A. Legal standards

A claim for private nuisance arises from a property owner's right to use and enjoy his land. *Schillaci v. Sarris*, 997 N.Y.S.2d 504, 507 (App. Div. 2014).   While "'use and enjoyment' encompasses the pleasure and comfort derived from the occupancy of land and the freedom from annoyance[,] not every annoyance will constitute a nuisance." *Domen Holding Co. v. Aranovich*, 802 N.E.2d 135, 138-39 (N.Y. 2003) (internal citations omitted).  Nuisance is characterized by a pattern of continuing, objectionable conduct. *Id.* (citing *Frank v Park Summit Realty Corp.*, 573 N.Y.S.2d 655, 656 (App. Div. 1991)); *see also Nussbaum v. Lacopo*, 265 N.E.2d 762, 765 (N.Y. 1970); *Berenger v. 261 W. LLC*, 940 N.Y.S.2d 4, 11 (App. Div. 2012) (collecting cases); *but cf.*

*Vacca v. Valerino*, 791 N.Y.S.2d 784, 785 (App. Div. 2005) (upholding jury finding that defendants' construction and shoddy maintenance of a retaining wall, which defendants knew both encroached and threatened to collapse upon plaintiffs' property, constituted private nuisance). Unlike trespass, which requires an intentional, unjustified entry onto the land of another, nuisance requires no "actual intrusion" onto the land, nor any "actual damage to the property itself." *Schillaci*, 997 N.Y.S.2d at 507.

To establish liability for a private nuisance, plaintiffs must prove intentional action or inaction that substantially and unreasonably interfered with the use and enjoyment of their property. *Copart Indus. v Consolidated Edison Co. of N.Y.*, 362 N.E.2d 968, 971-72 (N.Y. 1977). "[P]laintiffs must demonstrate their entitlement to monetary damages[.]" *Guzzardi v. Perry's Boats, Inc.*, 460 N.Y.S.2d 78, 82 (App. Div. 1983). "Where the injury is permanent, the measure of damages for private nuisance is the diminution of the market value of the property, or where the injury is temporary, the [measure is the] reduction of the rental or usable value of the property." *Id.* (internal citations omitted). Plaintiffs seeking punitive damages must demonstrate that "the acts complained of were calculated or done with a malicious intent to injure the plaintiffs." *Anderson v. Elliott*, 807 N.Y.S.2d 101, 102 (App. Div. 2005).

Here, the Hogans seek compensatory and punitive damages stemming from interactions and events that occurred between July 2008 and June 2017. According to the Hogans, these approximately 12 incidents, taken together, amount to private nuisances. The Hogans did not, however, present any evidence suggesting—nor did they allege in their Complaint—that any of the Hogans' land suffered a diminution of its market value or a reduction of the rental or usable value. *See* Am. Compl., Doc. 4 ¶¶ 57-58 (seeking private nuisance damages for Hogans' inability to "secure the private enjoyment of their property and los[s of] the enjoyment of their family,

friends, [and] their property [because they] suffered fear, stress, pain, emotional upset, mental anguish, and [have] been forced to endure outrageous and undue mental suffering and inconvenience"). This failure to set forth appropriate damages dooms the Hogans' claims without the necessity of further examination by the Court. However, the Hogans' claims fail on other grounds.

## B. Defendants did not create or maintain private nuisances

Much of the testimony offered by the Hogans was irrelevant as it concerned conduct that did not originate on—or even involve the use of—Defendants' land; accordingly, the described events do not constitute private nuisances.[8] *Compare, e.g., Schillaci v. Sarris*, 997 N.Y.S.2d 504, 507 (App. Div. 2014) (large number of waterfowl attracted by neighboring pond allegedly constituted private nuisance); *JP Morgan Chase Bank v. Whitmore*, 838 N.Y.S.2d 142 (App. Div. 2007) (noise generated by neighboring complex's exhaust fans, which prevented plaintiff from sleeping, allegedly constituted private nuisance); *Zimmerman v. Cormack*, 739 N.Y.S.2d 430 (App. Div. 2002) (outdoor neighboring property's stereo playing loudly for long periods of time, and accumulation of dog waste, garbage, and rotting food on neighboring property allegedly constituted private nuisance); *Guzzardi v. Perry's Boats, Inc.*, 460 N.Y.S.2d 78 (App. Div. 1983) (excessive number of automobiles and loud crowds attracted to neighboring business allegedly constituted private nuisance); *Copart Indus. v Consolidated Edison Co. of N.Y.*, 362 N.E.2d 968

---

[8] The Court refers here to the following incidents in which the parties were shouting at or otherwise hostile towards each other, none of which affected the Hogans' use of their land: the July 2008 incident described by Sakowich, involving a pile of debris placed at an unknown time by unknown persons on Hogans' Lots 12 and 13; the July 2008 "turtle incident;" the July 2008 motorcycle incident; the August 2008 interaction between Mark Hogan, Vandewater, Falter, Wilson, and other non-party individuals; the 2012 "party barge" on Lake 1 incident; various "swerving" incidents on Hiawatha Lake Road; and various complaints made to law enforcement. Instead, these incidents sound in Hogans' previously-dismissed claims involving intentional infliction of emotional distress, conspiracy, and racial animus. *See* Doc. 236.

(N.Y. 1977) (noxious emissions from neighboring smokestack allegedly constituted private nuisance). Thus, the Court addresses below only the following four incidents.

1. *Claims involving steel cables, signs, and other objects across and near Rose's driveway on Lot 24*

The following facts are undisputed. Beginning in April 2010, Rose installed motion-censored cameras across his Lots 23 and 24. These cameras instantaneously take and email pictures when movement is sensed. On April 26, 2010, the cameras captured and emailed to Rose pictures of Mark Hogan and Hogan's ATV on a dirt path that Rose has historically used as his driveway, and that Rose considers to be part of Lot 24. Defs.' Ex. 11. After receiving these emails, Rose, who was away from the subdivision, asked Falter and another non-party neighbor to install steel cables across this dirt path. Rose had previously installed such a cable in this location, but it had been removed by someone other than Rose. Falter and the non-party neighbor installed the cable that day. Wilson was also present, though she did not help install the cable. Later that day, Rose received from his camera pictures depicting Hogan arriving on his ATV, removing the cable, and leaving immediately thereafter. Defs.' Ex. 11.

On May 1, 2010, Vandewater marked Hogans' easement to Lots 22-19 by sticking wooden posts with orange flags in the ground and hanging signs that read "Rose Back Line," "12' R.O.W. [right of way]," and "right of way, here." Defs.' Exs. 12a-f; Pls.' Exs. 2n-2o.

On May 14, 2010, Rose had another cable, as well as a "no trespassing" sign, installed across the dirt path. That same day, Rose received from his camera pictures depicting Hogan arriving on his ATV, removing the cable and signs, and leaving immediately thereafter. Defs.' Ex. 13.

On May 15, 2010, Rose placed sawhorses and no trespassing signs on either side of the dirt path. *Id.* That same day, Rose received from his camera pictures depicting Hogan arriving in one

of his cars, picking up and moving the sawhorses to the side of the path, and driving away. Later still, Rose received from his camera pictures depicting Hogan returning to the path, removing the sawhorses and signs from where he had left them, putting them in his trunk, and driving away. *Id.* Hogans allege that Defendants' actual or constructive placement of these cables and sawhorses invaded their right of way to Lots 22-19 and constituted a private nuisance.

The Court has found that Frymire's survey is determinative of the location of the Hogans' easement as it intersects with the southeasterly corner of Lot 23 at a distance of 151 feet from Lot 23's existing shoreline of Hiawatha Lake 1 and proceeds along the back lot line of Lot 23 at this distance. For the same reasons, the Court finds that Frymire's survey is determinative of the boundaries of Lots 23 and 24. Frymire's survey places the entire dirt path, marked as "driveway," squarely within Rose's Lot 24. Defs.' Ex. 6. Thus, the driveway is not part of Hogans' easement to Lots 22-19. As a property owner, Rose may install (and direct others to install) cables, signs, and other reasonable objects as he chooses.

Moreover, the Hogans offered no evidence regarding how these cables, signs, and sawhorses interfered with their current or future use of their vacant Lots 22-19. *Compare Jones v. N.Y. Cent. & H.R.R. Co.*, 144 A.D. 55 (App. Div. 1911) (vacant lot owner potentially entitled to recover for damages stemming from neighboring factory's emitting smoke and soot onto property); *Busch v. N.Y., L. & W.R. Co.*, 12 N.Y.S. 85, 86 (Super. 1890) (vacant lot owner entitled to recover damages where neighboring property's "stagnant and offensive" water pits would impair future rental or sale value). In fact, as demonstrated at trial the cables and sawhorses on Lot 24 in no way impacted Hogan's ability to access or use Lot 22-19. Furthermore, Hogan did not even attempt to access his lots after removing the cables and sawhorses. Accordingly, the Court finds that Defendants neither created nor maintained a private nuisance when Rose and

Falter installed these cables on Rose's property.[9] *See, e.g., Guzzardi v. Perry's Boats, Inc.*, 460 N.Y.S.2d 78, 81-82 (App. Div. 1983); *Copart Indus., Inc. v. Consol. Edison Co. of N.Y.*, 362 N.E.2d 968, 971 (N.Y. 1977).

>   2.  *Claim involving boulders placed around a portion of the driveway to Hogans' Lots 10-14*

Sometime between 2010 and 2012, Vandewater placed a number of boulders on a stretch of Great Lot 24 that bordered a portion of the driveway Hogans' used to access their Lots 10-14. Defs.' Exs. 37, 38, 38a. Vandewater testified that he installed the boulders in response to Hogan repeatedly driving off of the driveway and onto Vandewater's property. Once on Vandewater's property, Vandewater testified, Hogan would do "spin outs" with his truck, thereby causing damage to Vandewater's lawn. According to Hogan, these boulders narrowed the driveway to such an extent that he could no longer get propane, which was delivered by a large truck, to his cabin. Further, Hogan claims, Vandewater placed the boulders with the intention of blocking Hogans' right of way. On cross-examination, however, Hogan seemed to admit that he had—at some point after the boulders were placed—gotten propane and other basic accessories onto his property using an "alternative" route. In any event, the boulders were placed only along one side of the driveway; on the other side of the driveway, sits Hogans' property. Defs.' Ex. 38a. Thus, the Hogans could widen the driveway if they so chose. Accordingly, the Court finds that the boulders do not substantially and unreasonably interfere with the Hogans' use and enjoyment of their property, and, therefore, do not constitute a nuisance. *See, e.g., Lawrence Wolf v. Kidding Brige Corp.*, 733 N.Y.S.2d 322, 323 (App. Div. 2001) (interference must render plaintiff's

---

[9] Hogan additionally testified that he came across other objects near Rose's structures on Lots 23 and 24—as well as vehicles parked on Rose's property—all of which, Hogan believes, were placed there in order to "block" his right of way to Lots 22-19. Again, the placing of such objects did not constitute a private nuisance. *See, e.g., Guzzardi*, 460 N.Y.S.2d at 81-82; *Copart*, 362 N.E.2d at 971.

enjoyment of neighboring property especially uncomfortable or inconvenient); *Turner v. Coppola*, 424 N.Y.S.2d 864, 866 (Sup. Ct. 1980) (interference must be substantial, as assessed by offensiveness, inconvenience, or annoyance to a normal person in the community where customs of the community are to be taken into account).

### 3.   Claim involving fireworks launched from Lots 34-38

Since 2008, Falter and Wilson have launched fireworks on July 4th.  One year they additionally launched fireworks on July 14th in celebration of Falter's 40th birthday.  According to Hogan, these fireworks are noisy, "professional grade, four inch mortars" that routinely landed in the wooded area of his property, at one point burning a hole in one of his tents.  Further, Hogan maintains that Falter and Wilson intentionally aimed the fireworks at his Lots 10-14.  In support of their claim, the Hogans submitted an audio recording of one such firework launch. Pls.' Ex. 20.

The recording does not contain audio indicative of people surrounded by dangerous, falling firework mortars.  *See id.* (capturing calm conversation between Hogan and Sakowich).  Further, during his testimony, Hogan presented a number of photographs and audio and video recordings of relevant events; yet, he submitted no such evidence of the alleged fireworks' damage to his property. *Compare* Pls.' Ex. 8 (photographs of fireworks and fireworks apparatus).  Thus, Hogan provided no credible evidence that the fireworks actually fell onto or damaged his property, nor any evidence that Defendants intentionally aimed the fireworks at the Hogans' Lots 10-14.  Moreover, as credibly explained by Defendants, trees and other obstructions prevent one from seeing clearly (especially at night) to Lots 10-14, which are located across the Lake from Lots 34-38.  The Court additionally notes that Vandewater owns Lots 15 and 16, and the Wests own Lots 8 and 9, the lots adjacent to the Hogans' lots.  It is uncontested that Falter and Wilson have good relationships with both Vandewater and the Wests.  In the absence of credible evidence to the

contrary, the Court is skeptical at best that Falter and Wilson would risk fireworks landing on Vandewater or West property. In any event, fireworks launched once a year on a national holiday do not rise to the level of a "continuous invasion" or "sufficient impairment of plaintiffs' rights." *See Nussbaum v. Lacopo*, 27 N.Y.2d 311, 316 (1970) (finding that golf balls that landed in plaintiff's bushes one to two times per week, originating from neighboring golf course, constituted only "minimal trespasses" for which plaintiffs were not entitled to recover).

   *4.   Claim involving Vandewater's Kubota and Hogan's tent*

   A good portion of the testimony in this case involved the encounter that took place between Defendants Vandewater and Rose, and Plaintiff Mark Hogan, Hogan's son John, and John's friend, Denny Okudinani. Vandewater and Rose were, at the time, in Vandewater's Kubota; the boys were camping in a tent on the Hogans' Lots 6 and 7; and Hogan was on or near his Lots 10 through 14. The testimony was conflicting and contentious. The encounter was the same. The Court will not render a decision as to the credibility of the witnesses. The Court need not do so because the incident does not come close to qualifying as a private nuisance. There was no condition or object originating from Defendants' land, let alone one that was continuing, and there was no impact on the Hogans' land. *See, e.g., Schillaci v. Sarris*, 997 N.Y.S.2d 504 (App. Div. 2014); *JP Morgan Chase Bank v. Whitmore*, 838 N.Y.S.2d 142 (App. Div. 2007); *Zimmerman v. Cormack*, 739 N.Y.S.2d 430 (App. Div. 2002); *Guzzardi v. Perry's Boats, Inc.*, 460 N.Y.S.2d 78 (App. Div. 1983); *Copart Indus. v Consolidated Edison Co. of N.Y.*, 362 N.E.2d 968 (N.Y. 1977). Moreover, the Hogans did not offer any evidence of resulting diminution of the market value of the property, or reduction of rental or usable value of the property, entitling them to damages. *See Guzzardi*, 460 N.Y.S.2d at 82-83. This incident was rather yet another clash between these neighbors in the continuing saga of unpleasantness that makes up the list of incidents before the Court. While the

Hogans would have the Court find that in this instance they are the victims of a private nuisance inflicted on them by Defendants, the Court finds otherwise. *See, e.g., id.*; *Lawrence Wolf v. Kissing Bridge Corp.*, 733 N.Y.S.2d 322 (App. Div. 2001).

In sum, the Court concludes that the Hogans' claims of nuisance against the Defendants amount to little more than repeated accusations that Hogan has made in prior and other pending lawsuits; that is, the manifestation of his hostility towards his neighbors that he repeatedly asserts in various courts. As described above, many of these amount to no more than the irritations that come with living in close proximity to others. Few, if any, even occur on land owned by a Defendant. None meet the requisites of legal nuisance.

Hogan has been castigated by other judges; and has had punitive damages assessed against him by a jury of his peers. Yet, he persists in his campaign of lawsuits. While it is unlikely that this Court's decision will be the last in this ongoing battle, the Court is hopeful that putting the issue of the location of the easement to rest might result in the mitigation of hostilities.

## IV.     CONCLUSION

Having heard testimony at a trial before this Court, and having reviewed and considered the exhibits, testimony, and all other relevant materials, the Court rules as follows:

1.    The survey offered by Duane Frymire is determinative of the boundary lines of Lots 23 and 24. The side lot line adjoining Lots 23 and 22 begins at the existing shoreline of Hiawatha Lake 1 and spans 151 feet. The Hogans' easement intersects with the southeasterly corner of Lot 23 at a distance of 151 feet from Lot 23's existing shoreline of Hiawatha Lake 1, and it proceeds along the back lot line of Lot 23 at this distance and according to Frymire's survey. Vandewater marked the relevant portion of Plaintiffs' 12-foot easement as beginning at this location. Accordingly, Plaintiffs failed

to establish that Vandewater interfered with their easement to Lots 22-19. The Court finds for Defendant Vandewater on Plaintiffs' interference with easement claim.

2. Plaintiffs did not allege any diminution of the market value of any of their property, nor any amount of reduced rental or usable value of any of their property. Accordingly, they are not entitled to damages stemming from alleged private nuisances.

3. Plaintiffs failed to prove that Defendants created or maintained private nuisances on their respective lots. The Court finds for all Defendants on Plaintiffs' private nuisance claims.

For these reasons, Plaintiffs' claims are HEREBY DISMISSED WITH PREJUDICE.

Dated this 14th day of July, 2017.


BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE